UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————x

SAMANTHA RYS,

          Plaintiff,

vs.                                           <u>COMPLAINT</u>

SABRINA DAVIS and TANYA JOHNSON,

          Defendants.
————————————————————x

By and though her counsel, Michael H. Sussman, Esq., plaintiff Samantha Rys complains of defendants as follows:

<u>PARTIES</u>

1. Plaintiff Samantha Rys is an adult of legal age who resides in the County of Orange. She may sue and be sued.

2. Defendants SABRINA DAVIS AND TANYA JOHNSON are adults of legal age conducting business within this judicial district. They are state actors and undertook the actions and omissions complained of herein under color of state law and while acting in supervisory positions. Plaintiff and these defendant supervisors worked in all five boroughs, including those within the compass of this Honorable Court.

<u>JURISDICTION</u>

3. As plaintiff alleges that defendants violated her constitutional right to equal protection of the law on account of her race as guaranteed by the Fourteenth Amendment, this court has jurisdiction over this matter pursuant to 42 U.S.C. secs. 1983 and 1988 and 28 U.S.C. secs. 1331 and 1343 (a)(3) & (4).

1

STATEMENT OF FACTS

4.  On May 21, 2021, after obtaining a reachable score on the state civil service examination given on June 10, 2017, and successfully completing the training academy, plaintiff, who is Caucasian, was sworn in as a Parole Officer and assigned to work from an office in Brooklyn, New York.

5.  During firearms training, one of her instructors, "Price," asked where each of his trainees were going.  Plaintiff responded "Brooklyn".  Price laughed as if in shock and stated that plaintiff would really "stick out" there.

6.  Likewise, during the academy, supervisor parole officer Hamilton stated that plaintiff was in for a culture shock when she went to Brooklyn.

7.  At the time, plaintiff did not know why Price was laughing or what Hamilton was referring to, but she would soon find out.

8.  Between the commencement of her employment and her constructive discharge on August 2, 2021, defendants, both of whom are African American, supervised plaintiff.

9.  The staff at the parole office to which plaintiff was assigned was overwhelmingly comprised of African Americans and Latinos.

10.  Plaintiff was one of very few Caucasian parole officers assigned to this office.

11.  Shortly after plaintiff commenced working at this office, her African American colleagues began making explicit references to her race.

12.  The month after she arrived in Brooklyn, plaintiff explained to defendants Johnson and Davis that she had a very long commute from her home in western Orange County.

2

13. By then, plaintiff understood that her employer had assigned many persons who had scores far lower than hers on the civil service examination much closer to her home.

14. At defendant Davis' suggestion, on June 16, 2021, plaintiff sent an email requesting a transfer to an office closer to her home.

15. Plaintiff received no reply to her request.

16. Plaintiff performed her out-of-office duties by herself, without a partner.

17. When she asked a peer to travel with her, the co-worker told plaintiff that she needed a spray tan and a hat before she could go out on the streets because the only white people who came to the neighborhoods to which she was assigned came to arrest people or take their child.

18. Another co-worker told plaintiff she was the snow cone in the building and made clear that she did not fit in and could not safely do her job on account of her race.

19. Defendants gave plaintiff a very challenging case load of parolees located throughout the City of New York, including persons who had committed very serious crimes and were non-compliant as parolees.

20. When she left employment, one parole officer wrote that she had nightmares, expecting to be provided cases from plaintiff's caseload.

21. On one occasion, plaintiff became aware that one of her parolees, AR, had violated the terms of his parole; plaintiff was required to write up a violation of parole with a warrant and did so.

22. Upon learning that plaintiff wrote him up, this parolee began making vicious threats against plaintiff and her family.

3

23.  Plaintiff took these threats seriously because the parolee had been convicted of attempted murder 2d for revenge after admitting to shooting a man in the back.

24.  On June 23, 2021, while at plaintiff's office, AR began threatening her in the presence of other parole officers.

25.  When plaintiff began claiming he was going to kill himself because he did not want to go to Riker's Island, parole officers took AR to the hospital.

26.  The following day, despite the death threats he made against plaintiff the day before, defendant Johnson assigned plaintiff hospital duty, contravening Directive No. 9730.

27.  Plaintiff's co-workers told her they had never seen a parolee behave in such a threatening and outrageous manner.

28.  Plaintiff called defendant Johnson, her supervisor, and asked to be removed from hospital duty and explained why.

29.  Defendant Johnson did not initiate any transfer or alter plaintiff's assignment.

30.  Later that same day, plaintiff contacted defendant Davis with the same request with the same outcome.

31.  Plaintiff reported to defendant Davis these outrageous physical threats of harm that she had personally heard from the parolee and that others reported to her.

32.  Based on the intensity and severity of AR's threats, Office of Special Investigator [OSI] investigator Holland requested that defendants transfer the threatening parolee from plaintiff's caseload to another parole officer's caseload and lodge new violations against him.

4

33. Defendant Davis refused to do so and required that plaintiff continue to be responsible for the parolee who, she knew, had threatened to rape, kill and dismember plaintiff.

34. Defendant Davis was supposed to gather evidence pertinent to the threats AR made against plaintiff.

35. However, defendant Davis failed to get statements from nine other parole officers who witnessed or heard AR's threats.

36. Consequently, Holland, the OSI investigator told plaintiff that he had no record of AR threatening her life in front of nine other parole officers.

37. Plaintiff wrote a threat report and unusual incident report and submitted these to defendant Johnson.

38. Defendant Johnson forwarded these to defendant Davis.

39. On June 25, 2021, OSI sent defendant Davis an email advising that AR be removed from plaintiff's caseload because his threats were credible.

40. Defendants did not follow OSI's guidance.

41. Plaintiff continued to feel apprehension, fright and alarm arising from AR's threats, which she took seriously.

42. Plaintiff became aware that another parolee had killed a parole officer in the same office as that in which she worked, and this knowledge only exacerbated her fears.

43. On July 8, 2022, plaintiff stayed late to submit an SVOP on AR for the death threats he made to her and for his spitting in another officer's face while threatening plaintiff.

5

44. Bureau Chief Jeffries asked plaintiff to submit the SVOP to her supervisor, defendant Johnson.

45. However, after plaintiff emailed the document to her, defendant Johnson never reviewed it or submitted it for a parole violation hearing.

46. On July 16, 2021, plaintiff spoke with defendant Johnson about attending the parole violation hearing, expressing concern that AR would have the chance then to see her without her mask.

47. Again, defendant Johnson directed plaintiff to prepare a memo with her concerns.

48. Plaintiff heard nothing back before the hearing scheduled for July 19 and she attended the hearing, allowing AR to see her without a mask.

49. After the hearing, AR was released from Rikers because plaintiff's supervisors had failed to file the SVOP plaintiff had prepared and provided to them.

50. As a consequence of the dismissal of the VOP, AR was directed to report to the parole office at 15 2nd Avenue in Brooklyn, where plaintiff continued to work.

51. However, AR absconded and did not report.

52. Meanwhile, plaintiff was working the streets alone.

53. On July 22, 2021, plaintiff sent another Bureau's Chief, Jeffries, a plea for assistance in light of AR's death threats.

54. Jeffries removed AR from plaintiff's caseload.

55. Jeffries took plaintiff off the streets.

56. On July 29, 2021, OSI Sr. investigator Holland called plaintiff and advised that he did not feel plaintiff was at risk.

57. Plaintiff queried whether defendant Davis had reported to him that approximately nine other parole officers heard AR threaten her.

58. Holland denied every receiving writings from the vast majority of those who report to defendant Davis.

59. Plaintiff requested that Holland further investigate the situation.

60. On July 30, 2021, plaintiff's hours were changed, requiring her to travel to and from work in rush hour and further diminishing her sleep.

61. Plaintiff shared her concern that these hours made discharge of her job duties more difficult.

62. Starting July 30, 2021, allegedly to alleviate risk to her, plaintiff was permitted to park in the garage.

63. However, defendant supervisors failed to provide plaintiff with a garage door opener, requiring her to walk into the building to open the garage and then back to her car, incurring increased risk.

64. On August 12, 2021, OSI issued its final report, concluding that AR posed a credible threat to plaintiff and her family and recommending that AR be directed to report to a location different from the one at which plaintiff worked.

65. However, neither of plaintiff's supervisors, defendants Johnson or Davis, implemented OSI's recommendation and, as of the date plaintiff resigned her employment, AR remained assigned to the same building.

66. In so repeatedly and intentionally ignoring serious threats to plaintiff's safety, both defendants de-valued her and failed to apply agency policies which mandated the immediate transfer of a parolee who made threats as AR did and the lodging of a notice

of violation against a parolee like AR who threatens his parole officer with physical harm.

67. In failing to follow these standard policies and procedures, defendants deviated from substantive standards in which they had been trained and which they were obliged to follow.

68. In failing to adhere to these standard policies and procedures, defendants treated plaintiff in an inferior manner, explicitly understating the nature and import of the threats, exposing plaintiff to serious risks of physical injury and signaling to her that she was expendable.

69. Defendants did not similarly devalue minority parole officers or continue to expose them to such known risks.

70. Rather, when other parolees made threats of a like sort, they were transferred to the caseload of another parole officer and had charges lodged against them and, upon request, parole officers are provided safety transfers of the short defendants denied plaintiff.

71. As a direct consequence of defendants' conduct toward her, including their refusal to transfer her, plaintiff experienced significant anxiety, could not continue to work as a parole officer, and reluctantly resigned her position with significant pecuniary loss and emotional distress.

72. Said resignation constituted a constructive discharge as defendants made it impossible for plaintiff to safely discharge her duties or reasonably believe that she would receive the support critical for her to perform her job.

<u>CAUSES OF ACTION</u>

73. Plaintiff incorporates paras. 1-72 as if fully restated herein.

8

74. By treating plaintiff in a manner which significantly deviated from agency policy, defendants created a hostile work environment against her on the basis of her race and in violation of her right to the equal protection of the law as guaranteed by the Fourteenth Amendment to the United State Constitution as made actionable against them by and through 42 U.S.C. section 1983.

75. By constructively discharging her on account of her race, defendants violated plaintiff's right to the equal protection of law as guaranteed by the Fourteenth Amendment to the United State Constitution as made actionable against them by and through 42 U.S.C. section 1983.

PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Honorable Court accept jurisdiction over this matter, empanel a jury to hear and decide all matters within its lawful authority, award to plaintiff compensatory and punitive damages, the attorneys' fees and costs associated with the prosecution of this matter and enter any other relief required by law and/or equity.

Dated:  December 9, 2022

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & ASSOCIATES
PO BOX 1005
1 RAILROAD AVENUE, STE. 6
GOSHEN, NY 10924
(845)-294-3991
SUSSMAN1@SUSSMAN.LAW

Counsel for Plaintiff Samantha Rys

9