UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMANTHA RYS,

*Plaintiff*,

v.

SABRINA DAVIS *and* TANYA JOHNSON,

*Defendants*.

---

No. 22-CV-10758 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:
Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Jessica Michelle Acosta-Pettyjohn, Esq.
New York State Attorney General's Office
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

 Samantha Rys ("Plaintiff") brings this Action against Sabrina Davis ("Davis") and Tanya

Johnson ("Johnson") (together, "Defendants"), alleging hostile work environment and

constructive discharge on the basis of race in violation of the Equal Protection Clause of the

Fourteenth Amendment and pursuant to 42 U.S.C. § 1983.  (*See* Compl. (Dkt. No. 1).)  Before

the Court is Defendants' Motion for Summary Judgment (the "Motion").  (Not. of Mot. (Dkt.

No. 25).)  For the reasons discussed below, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' 56.1 Statement, ("Defs' 56.1") (Dkt.

No. 27), Plaintiff's 56.1 Statement, ("Pl's 56.1") (Dkt. No. 29 at 29–34), the Parties'

counterstatements, ((Dkt. No. 29 at 1–29) ("Pl's 56.1 Resp."); (Dkt. No. 36) ("Defs' 56.1

Resp.")), and admissible evidence submitted by the Parties.[1]

---

[1] Where a Party's denial fails to specifically controvert the fact in question, the fact is admitted to the extent the Court determines that it is supported by admissible record evidence. *See Santander Consumer USA, Inc. v. The City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at *1 n.1 (S.D.N.Y. Nov. 18, 2024) (citing *Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023) (deeming facts to which defendant asserted general denials admitted once the Court "scrutinized [p]laintiff's submitted evidence to determine whether the evidence supports [p]laintiff's statements")).  Here, Plaintiff fails to specifically controvert a number of Defendants' proposed facts.  For example, Defendants submit that Plaintiff's training lasted "for approximately two months."  (Defs' 56.1 ¶ 3.)  Plaintiff denies this fact and states, in sum:  "Deny.  Plaintiff completed the Academy on or about May 21 and commenced her assignment in Brooklyn on May 24, 2021."  (Pl's 56.1 Resp. ¶ 3 (citation omitted).)  This denial does not address, let alone controvert, the length of Plaintiff's training.  This pattern continues throughout Plaintiff's response.  (*Compare* Defs' 56.1 ¶ 53 ("Johnson would encourage POs to go on the field with partners . . . .") *with* Pl's 56.1 Resp. ¶ 53 ("Deny that Johnson ever encouraged any P.O. to go into the field with Plaintiff . . . ."); Defs' 56.1 ¶ 68 ("Due to A.R.'s threats and his whereabouts being unknown, and at the direction of a BC, Plaintiff was allowed to park in the building's garage." ) *with* Pl's 56.1 Resp. ¶ 68 ("She was first permitted to park in the garage on July 30, 2021.  Neither Johnson nor Davis arranged this.  Rather, this happened after Plaintiff went to another [BC] . . . ."); Defs' 56.1 ¶ 112 ("Following his release, A.R. was ordered to report to the Brooklyn Office, but he absconded and failed to report with no contact with the parole office.") *with* Pl's 56.1 Resp. ¶ 112 ("Deny.  A.R. absconded on July 19; there was no safety plan in place for plaintiff.").)  Accordingly, the Court will deem admitted those facts that Plaintiff fails to specifically controvert.

Plaintiff's noncompliance with standard summary judgment procedure does not end there.  Local Rule 56.1(d) requires that a denial to a proposed undisputed fact "must be followed by citation to evidence that would admissible and set forth as required by [Federal Rule of Civil Procedure] 56(c)."  Loc. Civ. R. 56.1(d) (Jan. 2, 2025).  Defendants argue that Plaintiff's 56.1 Statement includes proposed undisputed facts that "have no cite or contain Plaintiff's opinion" or "have vague citations with no pin cite."  (Defs' Reply. 3.)  "Where there are no citations or where the cited materials do not support the factual assertions in the Rule 56.1 Statements, the [C]ourt is free to disregard the assertion."  *Dealerwing LLC v. Lerner*, No. 21-CV-6429, 2024 WL 4252497, at *3 n.4 (S.D.N.Y. Sept. 19, 2024) (alterations adopted) (quoting *Nat'l Coal. on*

1.  Training and Assignment[2]

Plaintiff was employed by the New York State Department of Corrections and Supervision ("DOCCS") as a Parole Officer ("PO") from approximately May 2021 until her resignation on August 18, 2021.  (Defs' 56.1 ¶¶ 1, 126.)  Plaintiff underwent training at the "Academy" located in Albany, New York, between March and May 2021.  (*Id.* ¶¶ 2–3.)  The duties of a PO include monitoring parolees, protecting the community, providing parolees with appropriate resources, and ensuring that the parolee's terms and conditions are met.  (*Id.* ¶ 6.) Prior to her training, Plaintiff indicated that she had a preference for assignment to DOCCS locations north of New York City, (*id.* ¶ 4), but was offered the Manhattan office, (Decl. of Jessica Acosta-Pettyjohn ("Acosta-Pettyjohn Decl."), Ex. A ("Pl's Dep. Tr.") at 45:6–21; *see also* Defs' 56.1 ¶ 9).  During training, Plaintiff was informed that she was assigned to the Brooklyn Office.  (Defs' 56.1 ¶ 7.)  At the direction of Senior Parole Officer ("SPO") Hamilton, Plaintiff wrote a memo seeking to have DOCCS honor her Manhattan offer.  (*Id.* ¶ 9.)  During training, both SPO Hamilton and a training instructor informed Plaintiff that she would "stick out in the Brooklyn Office" and that the "Brooklyn Office would be an adjustment for her."  (*Id.* ¶¶ 72–73.)

_____

*Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 107 (S.D.N.Y. 2023)); *see also Finnegan v. Berben*, No. 20-CV-10231, 2024 WL 1242996, at *1 n.2 (S.D.N.Y. Mar. 22, 2024) (same). Accordingly, the Court will disregard those paragraphs that have no citation to the record.  (*See* Pl's 56.1 ¶¶ 7, 8, 21.)  In the future, failure by counsel to follow the rules, which apply to all attorneys appearing in this District, will result in sanctions directed at counsel.

[2]  The Court notes that the Parties spend time discussing Plaintiff's training and assignment to the Brooklyn Office.  (*See* discussion infra Section I.A.1.)  However, because neither Johnson nor Davis played any role in Plaintiff's assignment to Brooklyn, (*see* Defs' 56.1 ¶ 23), or in her training, (*see id.* ¶¶ 2–6 (failing to mention Defendants in any capacity with reference to Plaintiff's training)), these facts are largely irrelevant to Plaintiff's case.

Plaintiff's first day at the Brooklyn Office was May 24, 2021.  (*Id.* ¶ 10.)  Plaintiff's commute to the Brooklyn Office took approximately two to four hours each way.  (*Id.* ¶ 8.) Plaintiff was supervised by Johnson, a SPO, who in turn reported to Davis, a Bureau Chief ("BC").  (*Id.* ¶ 22.)  At 12:15 AM on her first day, Plaintiff submitted a P3 Transfer Form to DOCCS Human Resources, in which she requested a transfer to the Manhattan office because her Brooklyn assignment was a mistake, she had a high score on the PO exam, she had a long commute, and Manhattan was closer to her daughter's graduate school.  (*Id.* ¶ 11–12.)  Plaintiff requested transfer to five locations, all north of New York City.  (*Id.* ¶ 19.)  DOCCS employees can only be transferred upon completing training and reporting to their assignment work location, (*id.* ¶ 15), and need not secure supervisor sign off on transfer requests, (*id.* ¶ 20).  The deadline to submit a P3 Transfer Form was March 31, 2021.  (*See id.* ¶ 17.)  Employees requesting a transfer after the deadline are put on waitlists for their requested locations.  (*See id.* ¶¶ 17, 19.)  At a meet and greet on her first day, Plaintiff informed others that she did not know if she was supposed to be in the Brooklyn Office.  (*Id.* ¶ 21.)  On June 15, 2021, Plaintiff discussed her commute and transfer with Johnson, who instructed Plaintiff to contact personnel and submit a P3 form.  (*Id.* ¶ 25.)

### 2.  Partner Assignment

The Parties dispute the nature of partner assignment.  Defendants submit, and Plaintiff admits, that POs are assigned training partners.  (*See id.* ¶ 42; Pl's 56.1 Resp. ¶ 42.)  Defendants also submit that "[a] PO can ask any other PO to partner with them to go in the field, but it is not required and is at the discretion of the POs," (Defs' 56.1 ¶ 52), but Plaintiff denies this statement and claims that "[a]ll the POs in the office were assigned partners" and that she "was never given a partner and was forced to go in the field alone," (Pl's 56.1 Resp. ¶ 52).  Plaintiff's denial and

her briefing indicate, at best, a misunderstanding or, at worst, a willful misrepresentation of how partnering worked in the Brooklyn Office. The record evidence demonstrates that there are three types of partners: training, office, and field. Upon a parole officer's arrival at the Brooklyn Office, they are assigned a partner for on-the-job training. (Pl's 56.1 ¶ 41; *see also* Pl's Dep. Tr. at 80:8–19 ("They assigned you with a parole officer that may have been there before you . . . and you learned from them.").) This is also referred to as being assigned a partner for "field training." (*See* Defs' 56.1 ¶ 42; *see also* Acost-Pettyjohn Decl., Ex. B ("Davis Dep.") (Dkt. No. 26-2) at 51:8–52:12; 56:16–22.) Training partners are assigned by the BC. (*See* Davis Dep. Tr. at 53:23–57:4; Acosta-Pettyjohn Decl., Ex. C ("Johnson Dep.") (Dkt. No. 26-3) at 15:13–15.) Field training is usually conducted over the course of a new parole officer's first two weeks, (Pl. Dep. Tr. at 81:8–18), but Plaintiff's field training was shorter than two weeks because she was ill during this time, (*id.* 80:25–81:7). Parole officers are assigned office partners "for office coverage" such that, if a parole officer is absent, their office partner can handle "something [that] arises on [the absent officer's] caseload." (*See* Johnson Dep. Tr. at 71:12–20.) Finally, parole officers are *encouraged* "to go out in the field with a partner," (Johnson Dep. Tr. at 71:2–7), "as an overall safety concern, . . . just in case a parole officer may need assistance with themselves or with the individual that's out in the community," (*id.* 73:9–14).

On one occasion, Plaintiff asked PO Patricia Brown ("Brown" or "PO Brown") to accompany her, but Brown said she would not travel with Plaintiff unless she got a spray tan and hat "because there's no reason a white person goes down [to a particular neighborhood] unless they're arresting you or taking your kids." (Pl's 56.1 Resp. ¶ 57.) Plaintiff did not report this comment to either Johnson or Davis. (*Id.* ¶ 58.) On another occasion, Plaintiff asked two other POs to travel to a location in which she felt was unsafe; the POs were annoyed by Plaintiff's

request but agreed to accompany her.  (*Id.* ¶ 55.)  Plaintiff asked if one of the other POs could

drive because she had a three-and-a-half-hour commute that morning, but the other POs refused.

(*Id.*)  Plaintiff reported this incident to Johnson, who suggested that Plaintiff ask a different PO

to accompany her on fieldwork.  (*Id.* ¶ 56.)  Plaintiff made no complaints to Davis about

partnering with other POs.  (*Id.* ¶ 60.)

    3.  Workload

The BC assigns cases to POs by police precinct.  (Defs' 56.1 Resp. ¶ 16–17.)  The

number of POs assigned to a geographical region is determined by the number of parolees

residing in that region.  (Pl's 56.1 Resp. ¶ 63.)  A PO can expect to have between 25 and 70

assigned cases.  (*Id.* ¶ 65.)  Plaintiff asserts that she was assigned three precincts, while none of

the other African American POs was assigned more than two.  (Pl's 56.1 ¶ 19.)[3]  Plaintiff also

asserts that other POs noted her more onerous assignment.  (*Id.* ¶ 20 (citing a fellow PO's note

on a greeting card presented to Plaintiff on the occasion of her departure from the Brooklyn

Office).)

---

[3] Plaintiff asserts that "Davis has never denied that [P]laintiff was assigned three precincts while similarly situated African American parole workers were assigned . . . ."  (Pl's 56.1 ¶ 21.)  Plaintiff cites no record evidence in support of this fact.  Local Rule 56.1(d) clearly provides that "[e]ach statement by the movant or opponent under Rule 56.1(a) and (b) . . . must be followed by citation to evidence that would be admissible . . . ."  Local Civ. R. 56.1(d).  In this circumstance, the Court would consider such a fact only "to the extent it is undisputed by Defendants."  *Melvin v. County of Westchester*, No. 14-CV-2995, 2019 WL 1227903, at *1 n.1 (S.D.N.Y. Mar. 15, 2019).  Because this fact is disputed by Defendants, the Court will not consider it.  *See Moschetti v. New York City Dep't of Educ.*, No. 15-CV-3161, 2018 WL 4759787, at *1 n.1 (S.D.N.Y. Sept. 28, 2018) (noting that the Court "need not consider the unsupported facts in the [56.1] counter statements.").

<u>4.  Parolee A.R.</u>

On or about June 9, 2021, Plaintiff was assigned to supervise parolee A.R.  (Defs' 56.1 ¶ 81.)  On or about June 16, 2021, A.R. was arrested while residing at a shelter, which in turn required Plaintiff to write a violation of parole ("VOP") against A.R.  (*Id.* ¶¶ 83–84.)  On June 22, 2021, Plaintiff spoke to A.R. and asked him to report to the Brooklyn Office at 10:00 AM the following day.  (*Id.* ¶ 85.)  On June 23, 2021, A.R. did not make his appointment and instead arrived at the office after Plaintiff had left for the day, at which time he threatened other POs who he believed might be Plaintiff.  (*Id.* ¶¶ 86–87.)  A.R. was arrested and transported to a hospital for an evaluation after he threatened self-harm.  (*Id.* ¶¶ 88–89.)

On June 24, 2021, Johnson, with Davis' knowledge, directed Plaintiff to perform hospital duty because A.R. was assigned to Plaintiff.  (*Id.* ¶ 90; Pl's 56.1 ¶ 27.)  The Parties dispute whether Plaintiff's hospital duty contravened DOCCS custom and practice to separate a PO and parolee when the parolee has threatened the PO.  (*See* Defs' 56.1 Resp. ¶ 28.)  Upon meeting Plaintiff, A.R. screamed, yelled, and made threats of sexual and homicidal violence against Plaintiff and her family.  (Pl's 56.1 ¶ 29; Defs' 56.1 ¶¶ 92–93.)  Plaintiff called Johnson, informed her of A.R.'s threats, and requested she be taken off hospital duty, to which Johnson agreed.  (Def's 56.1 ¶ 96.)  Upon returning to the Brooklyn Office from the hospital, Plaintiff and Johnson spoke about the incident and Plaintiff completed an unusual incident report.  (*Id.* ¶¶ 98–99.)  Johnson immediately discussed the incident with Davis.  (Defs' 56.1 Resp. ¶ 25.)

On June 25, 2021, DOCCS Office of Special Investigations ("OSI") Investigator Holland began an investigation into the incidents regarding A.R and recommended to Davis that Plaintiff "be removed from [A.R.] and another PO should be assigned [to A.R.]"  (Pl's 56.1 Resp. ¶ 103; Defs' 56.1 Resp. ¶ 35.)  The Parties dispute whether Johnson received Holland's June 25

recommendations. (*See* Pl's 56.1 Resp. ¶ 122.) That day, Davis requested that Plaintiff file a police report regarding the incident in the hospital. (*Id.* ¶ 104.)

On July 19, 2021, Plaintiff appeared at a virtual hearing regarding A.R.'s arrest at the shelter. (*Id.* ¶ 109–10.) The Parties dispute whether it is customary or required by DOCCS policy that, following a parolee's threatening a PO, that the PO must still attend the parolee's VOP hearing. (*See id.* ¶ 116–17.) That day, A.R.'s VOP as it related to the shelter arrest was dismissed and he was released from custody. (*Id.* ¶ 111.) A.R. was ordered to report to the Brooklyn Office, but "absconded" and had no contact with the parole office. (*Id.* ¶ 112.) On or about July 23, 2021, A.R. was removed from Plaintiff's caseload. (*Id.* ¶ 114.)

On July 29, 2021, Davis, who no longer worked at the Brooklyn Office, forwarded an email from Investigator Holland to BC Granum, Davis' replacement. (*Id.* ¶ 118.) On July 30, 2021, in consideration of her safety, Plaintiff was permitted to park in the Brooklyn Office's garage, which was usually reserved for other employees and not POs. (*Id.* ¶ 67; Defs' 56.1 Resp. ¶ 53.) On August 12, 2021, Investigator Holland submitted his final report which recommended that Plaintiff should neither be A.R.'s PO nor work in the same borough as A.R. (Pl's 56.1 Resp. ¶ 120.) On August 18, 2021, Plaintiff submitted her resignation letter effective August 20, 2021. (*Id.* ¶ 126.)

## B.  Procedural Background

Plaintiff initiated this Action on December 21, 2022. (*See* Compl.) The matter was referred to mediation, (*see* Dkt. No. 15), which was unsuccessful, (*see* Dkt. No. 19). On May 20, 2024, Defendants filed their Motion for Summary Judgment. (*See* Not. of Mot.; Defs' Mem. in Supp. ("Defs' Mem.") (Dkt. No. 28); Defs' 56.1.) On June 20, 2024, Plaintiff filed her Opposition. (*See* Pl's Mem. in Opp. ("Pl's Opp.") (Dkt. No. 31); Pl's 56.1 Resp.; Pl's 56.1.) On

July 12, 2024, Defendants replied.  (*See* Defs' Reply in Supp. ("Defs' Reply") (Dkt. No. 35);

Defs' 56.1 Resp.)

II.  Discussion

A.  Standard of Review

        Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v.

Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

        "However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive

a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical'

possibility that his allegations were correct; he need[s] to 'come forward with specific facts

9

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule

56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

If "any portion of an affidavit [is] not based on personal knowledge[, it] should be stricken." *Gemological Inst. of Am., Inc. v. Zarian Co.*, 349 F. Supp. 2d 692, 697 (S.D.N.Y. 2004) (quoting *Larouche v. Webster*, 175 F.R.D. 452, 454–55 (S.D.N.Y. 1996)); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (noting that the district court was free to disregard hearsay statements and speculation in affidavits); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"). As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"). However,

> where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (citation omitted).

"[W]here [there is] nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in

11

[plaintiff's complaint]," the court may grant a defendant's motion for summary judgment. *Roland v. City of New York*, No. 20-CV-5392, 2024 WL 2832691, at *20 (S.D.N.Y. June 3, 2024) (citing *Jeffreys*, 426 F.3d at 555). *Jeffreys*, however, is inapposite where a plaintiff's "testimony [is] consistent and uncomplicated." *See Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019). In other words, a plaintiff's consistent, uncomplicated, and not "wholly improbable" testimony "may be independently sufficient to raise a genuine issue of material fact." *Id.* (citing *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016)); *see also Lara v. Port Auth. of New York and New Jersey*, No. 20-CV-10383, 2023 WL 2185853, at *6 (S.D.N.Y. Feb. 23, 2023) (finding that plaintiff's testimony, "[w]hile admittedly lacking specificity and rather thin," was nonetheless sufficient to defeat defendant's motion for summary judgment); *Drayton v. City of New York*, No. 17-CV-7091, 2021 WL 1163108, at *2–3 (E.D.N.Y. Mar. 26, 2021) (denying a motion for reconsideration of the court's earlier ruling that plaintiff's deposition testimony raised a triable issue of fact that survived summary judgment).

The Second Circuit has stated repeatedly that "an extra measure of caution is merited before granting . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quotation marks omitted). Because discriminatory intent is "elusive" in nature, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015), "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Banks*, 81 F.4th at 259 (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). That said, a plaintiff's "'reliance upon conclusory statements or mere allegations' will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228 (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). Summary judgment remains proper when "the

nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

B.  Analysis

In Opposition to Defendants' Motion, Plaintiff submitted a declaration.  (Decl. of Samantha Rys ("Pl's Decl.") (Dkt. No. 32).)  Defendants argue that Plaintiff's declaration "contradicts her deposition testimony" and was made "solely to create issues of fact to avoid the granting of summary judgment."  (*See* Defs' Reply 3–5.)  Courts note that "a non[-]moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Adler v. Penn Credit Corp.*, No. 19-CV-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) (quoting *Wheeler v. Kolek*, No. 16-CV-7441, 2020 WL 6726947, at *8 (S.D.N.Y. Nov. 16, 2020)).  Such self-serving declarations are also insufficient to create a genuine dispute of fact. *See Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. July 7, 2023) ("A conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact." (citation omitted)).  "Under the sham affidavit rule, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21-CV-4855, 2024 WL 522751, at *11 (S.D.N.Y. Feb. 9, 2024) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

Plaintiff's declaration qualifies as a sham affidavit because she attempts to create factual disputes that contradict her previous testimony.  For example, Plaintiff testified that she was not aware of her fellow PO's caseloads, (*see* Pl's Dep. Tr. at 166:7–14 ("Q: . . . [D]o you know what

everybody else's caseload looked like?  A:  I kept things in my lane.  I don't do that."), but now declares that she "was assigned three police precincts" and that "African American parole officers were assigned or two, most usually two," (Pl's Decl. ¶ 7).  Plaintiff's assertion as to the workload of Black coworkers is undermined by her disclaiming such knowledge in her deposition.  Plaintiff's declaration is further undercut by her testimony that she was assigned *two* precincts, not three as she claims in her declaration.  (*Compare* Pl's Dep. Tr. at 84:11–17 ("Q: And is it your understanding that all the parole officers in the Brooklyn office had parolees within all five boroughs?  A:  Yes.  My jurisdiction had two precincts though . . . which was different.") *with* Pl's Decl. ¶ 7 ("I was assigned three police precincts.").)  Plaintiff also testified as to a single instance in which racial comments were directed at her when her coworker, PO Brown, said she would not accompany Plaintiff "unless [she] get[s] a spray tan and a hat."  (Pl's Dep. Tr. at 157:12–158:8.)  In her declaration, Plaintiff now claims there were "two occasions" in which "African American POs declined to partner with [her] for what they express were race-based reasons"—the spray tan comment and an instance in which "[a]nother [parole officer] yelled to [Plaintiff] on the stairwell that [she] was a 'snow cone' and that going in the field where [she] was assigned would not be safe."  (Pl's Decl. ¶ 6.)  There is no mention of the snow cone incident or the parole officer who made that comment in Plaintiff's deposition.  (*See generally* Pl's Dep. Tr.)  Plaintiff testified that she only reported one instance of parole officers treating her poorly, (*see id.* 160:4–11 ("Q:  . . . Did you report anything else with—to S.P.O. Johnson regarding any treatment you received from the other parole officers?  A:  I did not.  It was just the whole—it wasn't like, it was the feeling of the entire office.  It's kind of like the feeling I got from [Defendants] as well.  You're not always—it's not always verbal."; *id.* 159:16–21 ("Q:  . . . Did you report [PO Brown saying Plaintiff needed a spray tan] to [Defendants]?  A:  I did not."):

when Plaintiff's fellow parole officers who accompanied her in the field "were so angry and . . . didn't talk to [Plaintiff] almost the entire day," (Pl's Dep. Tr. at 156:14–19). In her declaration, however, Plaintiff stated that she "viewed not having a partner as being all about [her] race" and that she "repeatedly raised [the] issue with Johnson about having to go out alone, without a partner, and asked for her assistance in that regard." (Pl's Decl. ¶ 10).

"Courts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that were not mentioned at deposition, noting that such circumstances strongly suggest a sham affidavit." *Chen v. Matsu Fusion Rest. Inc.*, No. 19-CV-11895, 2022 WL 3018105, at *4 (S.D.N.Y. July 29, 2022) (quoting *Golden v. Merrill Lynch & Co.*, No. 06-CV-2970, 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007)). In short, Plaintiff submits a declaration that pointedly contradicts her deposition testimony in an attempt to bolster her claims of disparate treatment, discussed infra Section II.B.1. This strongly suggests that Plaintiff's declaration is a sham affidavit, as opposed to one that merely "clarifie[s] and elaborate[s] on factual details provided in her earlier testimony." *Burgess v. Costco Wholesale Corp.*, No. 21-CV-5178, 2024 WL 4333617, at *4 n.13 (S.D.N.Y. Sept. 27, 2024) (alterations adopted) (quoting *Wongsing v. Wal-Mart Real Est. Bus. Tr.*, No. 20-CV-6029, 2021 WL 5304310, at *7 (S.D.N.Y. Nov. 15, 2021)), *appeal pending*, No. 24-CV-2816 (2d Cir. Oct. 24, 2024). Because Plaintiff's declaration qualifies as a sham affidavit, the Court concludes that Plaintiff cannot rely on the declaration to raise disputed issues of material fact. As such, the Court will not credit Plaintiff's new allegations as described above that contradict her deposition testimony. *See Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 250 (S.D.N.Y. 2021) (finding that the non-movant's declaration was a sham affidavit because it contradicted prior deposition testimony); *see also Jablonski v. Special Counsel, Inc.*, No. 16-CV-5243, 2025 WL 315884, at

*5 (S.D.N.Y. Jan. 27, 2025) (striking specific assertions from a sham declaration because those assertions contradicted the declarant's deposition testimony); *Chen*, 2022 WL 3018105, at *4 (disregarding new allegations in plaintiffs' affidavits where the "affidavits plainly qualify as sham affidavits"); *see also Kim v. DK Cosms.*, No. 19-CV-9079, 2022 WL 540675, at *3 (S.D.N.Y. Feb. 23, 2022) (disregarding an affidavit pursuant to the sham affidavit doctrine).

    1.  Hostile Work Environment

    Section 1983 provides a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "Of course, [Section] 1983 'is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.'"  *Soso v. New York City Dep't of Educ.*, No. 21-CV-4660, 2023 WL 2667048, at*5 (E.D.N.Y. Mar. 28, 2023) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Relevant here, the Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination, including a hostile work environment.  *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Butts v. New York City Dep't of Educ.*, No. 22-CV-4418, 2024 WL 4350430, at *6 (E.D.N.Y. Sept. 30, 2024) (same).

    A Section 1983 claim has two essential elements:  "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."  *Sareen v. Port Auth. of New York & New Jersey*, No. 12-CV-2823, 2013 WL 6588435, at *12 (S.D.N.Y. Dec. 16, 2013) (alteration rejected) (quoting *Annis v. County of Westchester*, 136 F.3d 230, 245 (2d Cir. 1998)),

*aff'd sub nom. Sareen v. The Port Auth. of New York & New Jersey*, 592 F. App'x 34 (2d Cir. 2015); *see also Lucien v. Williams*, No. 20-CV- 8020, 2023 WL 2648215, at *8 (S.D.N.Y. Mar. 27, 2023) (same).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [Section] 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Veras v. Jacobson*, No. 18-CV-6724, 2022 WL 2133842, at *5 (S.D.N.Y. June 14, 2022) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases)).  "A plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Zeigler v. Annucci*, No. 23-CV-707, 2024 WL 4252682, at *7 (S.D.N.Y. Sept. 20, 2024) (alteration adopted) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted) (explaining that "a plaintiff may not rely on a special test for supervisory liability")). Based on that requirement, the Second Circuit has recognized five theories of personal involvement for supervisory officials:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Haughey v. Cnty. of Putnam*, No. 18-CV-2861, 2022 WL 4468066, at *17 (S.D.N.Y. Sept. 26, 2022) (quoting *Grullon*, 720 F.3d. at 139 (alterations, italics, and quotation marks omitted)).

"In order to establish a hostile work environment claim . . ., a plaintiff must produce evidence that the complained of conduct '(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an

environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's . . . protected characteristic.'" *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 446 (E.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Robinson v. Harvard Prot. Servs.,* 495 F. App'x. 140, 141 (2d Cir.2012) (summary order) (quoting *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007))).[4] "In determining whether a work environment is hostile, [the] Court must consider the totality of the circumstances, which includes:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, No. 20-CV-10388, 2022 WL 1778488, at *2 (S.D.N.Y. June 1, 2022) (quotation marks omitted) (quoting *Reyes v. Westchester Cnty. Health Care Corp.*, No. 21-410, 2021 WL 4944285, at *3 (2d Cir. Oct. 25, 2021) (summary order)).

Defendants argue that the alleged conduct was neither severe nor pervasive and that Plaintiff has not established that the alleged conduct occurred because of Plaintiff's race.  (Defs' Mem. 13–19.)  Plaintiff counters that the totality of circumstances, including assignment of partners, disparate workload, and Defendants' alleged failure to timely reassign A.R. to another PO, resulting in feeling unsafe, establishes a hostile work environment.  (Pl's Opp. 5–11.)

First, there is no real dispute as to whether Defendants acted under color of state law because they are state employees, and "a public employee generally acts under color of state law

---

[4] "The standard for hostile work environment claims under Title VII, [Section] 1981, [Section] 1983, and the NYSHRL is the same."  *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 655 n.6 (S.D.N.Y. 2017) (quoting *Lewis v. Roosevelt Island Operating Corp.*, 246 F.Supp.3d 979, 989 n.5 (S.D.N.Y. 2017) (collecting cases)).  "Cases interpreting hostile work environment claims under these provisions are generally cited interchangeably." *Id.*

while acting in his official capacity or while exercising his responsibilities pursuant to state law."

*Roches-Bowman v. Evans*, 749 F.Supp.3d 479, 487 (S.D.N.Y. 2024) (alterations adopted)

(quoting *Savarese v. City of New York*, 547 F. Supp. 3d 305, 337 (S.D.N.Y. 2021) (quoting *West*

*v. Atkins*, 487 U.S. 42, 50 (1988))).  Because the alleged conduct was made possible only

through Defendants' authority as state employees who were Plaintiff's supervisors, the Court

finds for the purposes of the following analysis that Defendants acted under color of state law.

*See Feingold v. New York*, 366 F.3d 138, 144, 159 (2d Cir. 2004) (noting that the plaintiff "ha[d]

shown that the deprivations he allege[d] were under color of state law because they were

committed by state employees acting in their official capacities as [state] employees and

exercising their responsibilities pursuant to state law").  "Once action under color of state law is

established, the analysis for such claims is similar to that used for employment discrimination

claims brought under Title VII."  *Sareen*, 2013 WL 6588435, at *12 (quoting *Demoret*, 451 F.3d

at 149)).

　　　　To carry her burden on hostile work environment, Plaintiff must demonstrate that the

conduct giving rise to the alleged hostile work environment occurred *because* she is Caucasian.

*See Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *12 (E.D.N.Y.

Mar. 28, 2013); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d

Cir. 2014) ("Of course, 'it is axiomatic that mistreatment at work, whether through subjection to

a hostile environment or through other means, is actionable under Title VII only when it occurs

because of an employee's . . . *protected characteristic*,' such as race or national origin."

(alterations adopted) (emphasis added) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.

2001))); *Mercado v. Mount Sinai Beth Israel*, No. 21-CV-10467, 2023 WL 5975322, at *10

(S.D.N.Y. Sept. 14, 2023) (same).  Plaintiff points to three alleged instances of hostility:  that

Johnson assigned partners to all Black parole officers except Plaintiff, (*see* Pl's Opp. 7; Pl's 56.1 ¶¶ 5–8, 15); that Plaintiff's workload was more onerous than that of non-Caucasian parole officers, (*see* Pl's Opp. 7–8; Pl's 56.1 ¶¶ 16–21); and that Defendants deviated from established policies concerning Plaintiff's safety in the face of threats from A.R., (*see* Pl's Opp. 8; Pl's 56.1 ¶¶ 28, 35–37, 40–45). Plaintiff's allegations concerning partner assignment and workload are examples of disparate treatment, while her allegation concerning her safety as it relates to A.R. is facially neutral. The Court addresses these instances in turn and finds that Plaintiff has failed to carry her burden because she has not shown that the alleged conduct occurred because she is Caucasian.

As discussed above, there are three kinds of partners: training, office, and field. *See* supra Section I.A.2. The undisputed evidence indicates that Defendants assigned training partners, (*see* Johnson Dep. Tr. at 15:13–15 ("Q: Who assigned the field training officer to the individual trainee? A: The bureau chief.")), and office partners, (*see id*. at 71:2–6 ("Q: Well, in the supervision that you did of the parole officers, did the parole officers have partners? A: Partners are assigned for office coverage . . . .")), but *not* field partners, (*see id.* at 71:6–7 (" . . . I always *encourage* officers to go out in the field with a partner.") (emphasis added)). Plaintiff was assigned a training partner whose name she did not recall. (*See* Pl's Dep. Tr. at 80:20–23 ("Q: And do you remember who your . . . training officer was? A: Yes, but I can't remember her name right now.").) Plaintiff complains that Johnson did not assign her a field partner. (*See* Pl's Opp. 7; *see also* Pl's 56.1 ¶ 10 ("Johnson knew [P]laintiff did not have a partner, but did not assign her one and, instead, told her to find one herself.").) It is undisputed, however, that Johnson assigned office partners, but not field partners. (*See, e.g.*, Defs' 56.1 Resp. ¶ 9.) That other parole officers either did not want to go into the field with Plaintiff or conditioned their

willingness to accompany Plaintiff in the field on Plaintiff's driving, does not establish discriminatory conduct *by Defendants*.

It is undisputed that a parole officer can expect to have between 25 and 70 cases, (Defs' 56.1 ¶ 65), that parole officers are assigned certain precincts and manage cases that arise within those precincts, (*id.* ¶ 62; Pl's 56.1 ¶ 18), and that the number of parole officers "assigned to a geographical region is determined by the number of parolees residing in that region," (Defs' 56.1 ¶ 63). "Allegations of a heavier workload alone can support a viable hostile work environment claim if the plaintiff was subjected to disproportionately burdensome work assignments." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 466 (S.D.N.Y. 2023) (alterations adopted) (quotation marks omitted) (quoting *Wilson v. Family Dollar Stores of N.Y., Inc.*, No. 06-CV-639, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008)). Plaintiff, however, points to no record evidence that she was assigned more *cases* than her Black co-workers. Rather, she claims that she was assigned three precincts, whereas her Black co-workers each had a maximum of two. (*See* Pl's 56.1 ¶ 19.) As discussed above, Plaintiff's claim that she was assigned three precincts is undermined by her own testimony and is not credited by the Court. *See* supra Section II.B. Even if the Court did credit this statement, the number of assigned precincts does not establish that Plaintiff had a disproportionately burdensome work assignment than her Black co-workers because she may have had fewer cases on average per precinct. The only support that Plaintiff musters is a farewell card in which an unidentified colleague says that she has "nightmares about the 76, 78, 84. LOL," (*see* Pl's Decl., Ex. 1 (Dkt. No. 32-1)), and her belief that she had the "most undesirable caseload" because of conversations she had with and remarks by her co-workers, (*see* Pl's Dep. Tr. at 165:20–166:6). Plaintiff's belief as to her workload is undermined by her testimony that she did not know how many cases her Black co-

workers had, (*see* Pl's Dep. Tr. at 166:11–14 (Q:  . . . And did you—do you know what everybody else's caseload looked like?  A:  I kept things in my lane.  I don't do that.")), and by her admission that she "did not know the specific names and cases" that other parole officers had, (Pl's 56.1 Resp. ¶ 66).  As for the farewell card, it is difficult to credit Plaintiff's conclusory assertion that the comment references Plaintiff's assigned precincts when she testified that she did not recall her assigned precincts' numbers.  (*See* Pl's Dep. Tr. at 84:22–25.)  Even if the Court takes Plaintiff at her word, she neither testifies nor avers that the individual who wrote the comment was a parole officer or explains why Plaintiff's caseload gives the coworker nightmares.  That Plaintiff's precincts gave a coworker nightmares simply does not establish that Plaintiff had more cases than her Black co-workers.  At bottom, even if the Court adopts all the factual and logical assumptions that Plaintiff makes, Plaintiff has still failed to demonstrate that her workload was more onerous *in comparison* to that of her Black co-workers.  The complete lack of any evidence as to the number of cases that Plaintiff or any of her Black co-workers had is fatal to a hostile work environment premised on disproportionate workload.  *See Jaggon v. Community Health Servs., Inc.*, No. 18-CV-458, 2019 WL 4414953, at *10 (D. Conn. Sept. 16, 2019) (granting summary judgment as to a hostile work environment claim where plaintiff "provides no testimony or admissible evidence suggesting that the workload he was assigned was extraordinarily severe[,] [n]or does he testify as to the duration of the heavy workload he was allegedly assigned."); *Fiorillo v. United Techs. Corp.*, No. 13-CV-1287, 2016 WL 1118789, at *20 n.18 (D. Conn. Mar. 21, 2016) (granting summary judgment on a hostile work environment claim in part because plaintiff "fail[ed] to offer any advice for [his] belief" that "the workload was not evenly distributed and that one of her colleagues who received less work was a male[.]").

Finally, Plaintiff's claim that Defendants deviated from policy as it relates to A.R.'s threats is facially neutral. Facially neutral incidents may be considered among the totality of circumstances that courts consider in any hostile work environment claim, provided that Plaintiff offers "some circumstantial or other basis for inferring that incidents race-neutral on their face were in fact discriminatory." *Tassy v. Buttigieg*, 51 F.4th 521, 533 (2d Cir. 2022) (quoting *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 117–18 (2d Cir. 2010)); *see also Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 121 (S.D.N.Y. 2022) (same (citing *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002))). For example, "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-6199, 2022 WL 973861, at *11 (S.D.N.Y. Mar. 30, 2022) (internal quotations and citations omitted). Plaintiff points to only one instance in which her race was referenced in the Brooklyn Office—when PO Brown refused to be Plaintiff's field partner unless Plaintiff got a spray tan—and it is undisputed that Plaintiff did not inform Defendants of this incident. (Defs' 56.1 ¶ 58.) As discussed above, *see* supra Section II.B, the Court will not consider the "snow cone" incident that Plaintiff brings up only in her declaration. Plaintiff has not made any attempt to demonstrate Defendants' personal involvement in the comments made by her fellow parole officers that referenced Plaintiff's race, or that they were grossly negligent, or that Defendants were informed and failed to remedy the wrong. *See Zeigler*, 2024 WL 4252682, at *7 (setting out the five recognized theories of personal involvement for supervisory officials). Accordingly, because Plaintiff has not made the requisite showing, Defendants cannot be found liable for that, or any other, inappropriate comment by Plaintiff's coworkers. *See id.* at *11 (dismissing claim against a supervisory defendant where plaintiff failed to make the requisite showing of liability);

*Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *25 (S.D.N.Y. Mar. 26, 2009) (granting summary judgment on a hostile work environment claim where plaintiff failed to "present[] any reason to impute [coworker's] alleged conduct to [defendant employer]."), *aff'd*, 376 F. App'x 127 (2d Cir. 2010). None of Plaintiff's other allegations regarding Defendants' handling of the A.R. situation touch on race. (*See* Pl's 56.1 ¶¶ 22–53.) And Plaintiff simply does not make a coherent argument that Defendants' facially neutral handling of the A.R. situation was accompanied by circumstantial evidence of race-based discrimination. (*See* Pl's Opp. 5–12.) To the extent Plaintiff argues that her being the only Caucasian in the Brooklyn Office suffices to infer race-based discrimination, this argument also fails. Courts regularly hold that "being the only member of a protected class in a department does not give rise to an inference of discrimination." *Xu v. New York City Dep't of Health & Mental Hygiene*, No. 08-CV-11339, 2020 WL 8671952, at *34 (S.D.N.Y. Dec. 22, 2020) (citing *Watson v. Arts & Entertainment Television Network*, No. 04-CV-1932, 2008 WL 793596, at *17 n.5 (S.D.N.Y. March 26, 2008) (collecting cases), *aff'd*, 352 F. App'x 475 (2d Cir. 2009)), *report and recommendation adopted*, 2021 WL 1222119 (S.D.N.Y. Mar. 31, 2021); *see also Sosa v. Rockland Cnty. Cmty. Coll.*, No. 15-CV-3329, 2017 WL 3105872, at *5 (S.D.N.Y. July 20, 2017) ("[A] racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination." (quoting *Branch v. Sony Music Entm't Inc.*, No. 97-CV-9238, 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001))).

Simply put, even assuming that Plaintiff had demonstrated that the alleged failure to assign her a partner, the alleged disproportionate workload, or alleged deviation from policy was objectively and subjectively hostile, she has failed to carry her burden in showing that any instance of hostility was related to Plaintiff's being Caucasian. Accordingly, Defendants are

entitled to summary judgment on this claim. *See Alvarado*, 631 F. Supp. 3d at 121 (granting summary judgment on hostile work environment claims where plaintiff pointed only to facially neutral incidents and failed to present any evidentiary basis to infer that the incidents were because of plaintiff's protected categories); *Stern v. McDonough*, No. 18-CV-71, 2022 WL 4236298, at *7–8 (N.D.N.Y. Sept. 14, 2022) (granting summary judgment where the record lacked any evidence that the alleged conduct occurred because of Plaintiff's protected category); *Lopez v. White Plains Hosp.*, No. 19-CV-6263, 2022 WL 1004188, at *10 (S.D.N.Y. Mar. 30, 2022) (granting summary judgment because plaintiff's subjective belief that facially neutral conduct reflected discriminatory intent was insufficient to carry her burden).

### 2. Equal Protection & Constructive Discharge

Plaintiff also argues that she was constructively discharged on account of her race in violation of the Equal Protection Clause. (Compl. ¶ 75.) A constructive discharge claim is "difficult to establish and [is] routinely rejected by the courts." *Tassy*, 2023 WL 144112, at *6 (quotation marks omitted) (quoting *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325 (S.D.N.Y. 2005)).

> An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily . . . . [W]orking conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Cole-Hatchard v. Hoehmann*, No. 16-CV-5900, 2020 WL 5645815, at *12 (S.D.N.Y. Sept. 21, 2020) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003)).

This standard is "higher than the standard for establishing a hostile work environment." *Dixon v. City of New York*, No. 23-CV-8941, 2025 WL 50140, at *10 (S.D.N.Y. Jan. 7, 2025) (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)); *see also Kunik*, 842 F. App'x at 671 (same). And so courts have found that, where a hostile work

environment claim fails, the related constructive discharge claim must also fail. *See Chislett v. New York City Dep't of Educ.*, 723 F. Supp. 3d 285, 300–01 (S.D.N.Y. 2024) (granting summary judgment on a constructive discharge claim because the court had also granted summary judgment on the underlying hostile work environment claim), *appeal pending*, No. 24-CV-972 (2d Cir. Apr. 15, 2024); *Buczakowski v. Crouse Health Hosp., Inc.*, No. 18-CV-330, 2022 WL 356698, at *12 (N.D.N.Y. Feb. 7, 2022) (granting summary judgment and dismissing a constructive discharge claim "because it relies on the failed hostile work environment claim" and collecting cases); *Harewood v. New York Dep't of Educ.*, No. 18-CV-5487, 2019 WL 3042486, at *7 (S.D.N.Y. May 8, 2019) (holding that, because plaintiff "failed to allege facts sufficient to state a plausible claim of hostile work environment, she likewise . . . failed to state a claim of constructive discharge" (citing *Chenette v. Kenneth Cole Productions*, 345 F. App'x 615, 620 (2d Cir. 2009) (summary order), and *Divers v. Metropolitan Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at *19 (E.D.N.Y. Jan. 14, 2009))), *report and recommendation adopted*, 2019 WL 2281277 (S.D.N.Y. May 29, 2019).  Accordingly, because Plaintiff fails to carry her burden on her hostile work environment claim, the Court finds that Defendants are entitled to summary judgment on the constructive discharge claim.

III.  Conclusion

For the reasons set forth above, Defendants' Motion is granted in its entirety.  The Clerk of the Court is respectfully directed to enter judgment accordingly, terminate the pending Motion at Dkt. No. 35, and close this case.

SO ORDERED.

Dated:    March 24, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge